HANOVER INSURANCE COMPANY, SUCCESSOR IN INTEREST TO: MASSACHUSETTS BONDING AND INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1557–71.    Filed November 22, 1977.

*Paul A. Teschner,* for the petitioner.

*Williard J. Frank* and *W. Terrence Mooney,* for the respondent.

## OPINION

WILES, *Judge:* This case was assigned to Special Trial Judge Lehman C. Aarons (pursuant to Rules 180, et seq., of the Tax Court Rules of Practice and Procedure) to conduct the trial thereof or otherwise proceed in accordance with said Rules. His report was filed on July 15, 1977, and subsequently both parties filed exceptions to his report. The exceptions have been considered and are rejected. The Court agrees with and adopts the report set forth below.

## OPINION OF THE SPECIAL TRIAL JUDGE

AARONS, *Special Trial Judge:* Respondent determined deficiencies in petitioner's[1] Federal income tax for the taxable years ended December 31, 1959 and 1960, in the respective amounts of $441,081.10 and $446,206.34. The taxable period ended June 30, 1961, is also involved because of respondent's adjustment of a net operating loss for that period which was carried back to 1959. Although respondent, in an amendment to his answer, claimed increased deficiencies such increases have been conceded by respondent.

The issues remaining for decision are (1) whether the reserves for unpaid losses carried by petitioner at the end of 1959, 1960, and the period ending June 30, 1961 (which are included in the computation of "losses incurred" under section 832(b)(5)), were unreasonable in amount and were properly reduced by respondent, and (2) if (1) is answered in the affirmative, whether a comparable reduction must be made to the reserve for unpaid losses carried by petitioner at the end of 1958, and deducted (under sec. 832(b)(5)) in determining 1959 losses incurred.[2]

---

[1] "Petitioner," as used hereinbelow, refers to Massachusetts Bonding & Insurance Co., the predecessor of Hanover Insurance Co.

[2] Petitioner continues to urge the invalidity of sec. 1.832–4(b) (formerly sec. 1.832–1(b)), Income Tax Regs. Although, indeed, that contention appears to constitute the major thrust of petitioner's opening brief, it is not an issue now before the Court; it was adjudicated at an earlier stage of this case in *Hanover Insurance Co. v. Commissioner,* 65 T.C. 715 (1976).

### FINDINGS OF FACT

Many of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated by this reference. Only those facts necessary for an understanding of the opinion will be summarized below.

Petitioner was a casualty insurance company having its principal office in Massachusetts. The returns for the years involved were filed with the District Director, Boston, Mass. Such returns were for the calendar years 1959 and 1960 and for the period ending June 30, 1961. Petitioner was merged into Hanover Insurance Co., and went out of existence as of June 30, 1961. Hanover Insurance Co., likewise has its principal office in Massachusetts.

Petitioner, during the period here at issue, wrote 24 lines of casualty (non-life) insurance. Petitioner filed annual statements with the Insurance Department of the Commonwealth of Massachusetts on the form approved by the National Association (formerly National Convention) of Insurance Commissioners (NAIC). With relatively negligible exceptions (which are not here at issue), petitioner computed its taxable income for each period here involved on the basis of the net income shown at line 20 of the underwriting and investment exhibit of such annual statement.

In arriving at its net income for annual statement purposes (and its gross profit for Federal income tax purposes), one of the principal deductions claimed by petitioner was "losses incurred." "Losses incurred" as claimed by petitioner for the years 1959 and 1960, and the period ended June 30, 1961, were respectively $19,264,486, $21,067,480, and $8,925,671. Basically, those figures were determined by adding to "losses paid-current year" the amount of "unpaid losses outstanding—current year" and deducting therefrom the amount of "unpaid losses—prior year."

The disputed adjustments (which result in reduction of "losses incurred") relate to the "unpaid losses" outstanding at the end of the periods here involved. The aggregate amounts of such unpaid losses (for all lines of insurance) claimed by petitioner and the aggregate adjustments asserted by respondent are:

|  | Claimed | Respondent's net reduction |
|---|---|---|
| Dec. 31, 1959 | $30,390,690 | $1,104,574 |
| Dec. 31, 1960 | 29,965,729 | 690,548 |
| June 30, 1961 | 27,415,563 | 113,180 |

In determining the amounts of the foregoing net reductions, respondent gave credit for the prior reductions in conformity with the requirement of the Internal Revenue Code that, in determining losses incurred, unpaid losses at the end of the preceding year are to be deducted from the sum of losses paid during the taxable year and unpaid losses outstanding at the end of the taxable year. However respondent made no adjustment to the unpaid losses claimed by petitioner as of the end of 1958 in the aggregate amount of $31,257,371. The aggregate amount of unpaid losses claimed by petitioner at the end of 1953, according to its annual statement for that year, was $30,097,672.

Petitioner used two basic methods to determine its reserves for unpaid losses. The so-called individual case method was used wherever possible; if not possible, a formula method was used. Under the case method, petitioner's home office claims examiner after receiving a report from the field, would establish a dollar value on estimated liability with respect to each case. The claims examiner was supposed to take into account a myriad of factors such as the severity of the injury or occurrence; negligence and contributory negligence; age, health, personal and emotional factors; location of the occurrence and the effect of local law; identity of lawyers; and other imponderable factors. The volume of individual cases was heavy. The only claims examiner who testified at the trial, examined as many as 150 claims per day. Establishment of case reserves of $1,000 or more required approval of petitioner's claims vice president. As further reports were received from the field the examiner would revise the case reserve upwards or downwards. The total amount of the case reserves was determinable at any time from the computer. No yearend adjustments were made to such reserves, nor (except as noted above) were changes in such reserves made by anyone at any time. It was contrary to petitioner's policy to inform claims examiners of their past performance based on development figures of previous loss claims.

Petitioner's primary use of a formula method of reserving for unpaid losses (i.e., the second basic method used by petitioner to

determine such reserves) was with respect to liability for occurrences which presumably had already taken place but which had not yet been reported to the claims department. IBNR (incurred but not reported) reserves were tentatively established by multiplying the premiums in force at the end of the accounting period by the ratio of the prior 2 years' average IBNR losses as developed over a 21-month period, to the average premiums in force during the current period. This tentative figure was then revised to take into account variables such as inflation and changes in rates. IBNR reserves constituted approximately 18 percent of the total claimed unpaid losses for 1959, and approximately 28 percent for 1960 and for the period ended June 30, 1961.

In connection with its business done through "pools" (syndicates formed to spread risks among several companies), petitioner also used a formula reserve figure which was supplied to it by the pool. Pools were separately audited, and were likewise regulated by NAIC. Petitioner did not make any independent investigation of its pooled claims. Pooled unpaid loss reserves constituted approximately 9 percent of petitioner's total claimed unpaid losses for 1959 and approximately 11 percent for 1960.

A formula was also used by petitioner in miscellaneous other situations. For example, to avoid unnecessary and unproductive paperwork so-called "notice claims" (e.g., claims up to $500 for auto property damage) were reserved by petitioner's statistical department on an actuarial basis. "Notice claims" constituted approximately 2 percent of petitioner's total claimed unpaid losses.

Respondent's method of testing the reasonableness of petitioner's unpaid loss reserves was based on the development (i.e., actual payments in subsequent years) of prior years' claimed unpaid losses. If a comparison between the current year's estimate and past years' experience in the same line of insurance indicated a current year overstatement of more than 15 percent, respondent reduced the current year's estimate to 115 percent of the average past years' experience.

In making such comparisons respondent applied a longer testing or development period for so-called Schedule P lines than for Schedule O lines of insurance in determining petitioner's "experience rate." Schedule P of the annual statement included auto liability, liability other than auto, and workmen's compen-

sation. Schedule O covered most of the remaining lines of insurance.

As to Schedule O, respondent's testing method applicable to the years before the Court is summarized as follows in Mim. R.A. No. 1366, issued by the Commissioner of Internal Revenue on July 1, 1944:

Information that will disclose the reasonableness of the unpaid loss liability as set up by the taxpayer may be secured from Schedule O of the Annual Statement. A comparison of the amounts paid in the first succeeding year plus the amount still estimated as unpaid at the end of such year, (developed losses) should be made with the previous year's estimate of unpaid losses (estimated losses) to determine the ratio of "estimated losses" to one-year "developed losses." Such comparison should be made separately for each year for the previous five years. If the average "estimated losses" of the previous five years is found to be not more than 115 percent of the five-year average of the one-year "developed losses," the estimates made will be regarded as being reasonably correct, and no adjustment for the current year would ordinarily be required.

In the event that the five-year average of "estimated losses" is in excess of 115 percent of the five-year average of the one-year "developed losses" then the unpaid loss liability of the company will be deemed to be excessive in the current year and an adjustment will ordinarily be required. * * *

With respect to Schedule P, respondent applied a similar testing method, but because Schedule P lines represented personal injury type claims that require a longer development in order to ascertain actual loss, a 5-year average of five years' development was used by respondent rather than a 5-year average of 1 year's development as in the case of Schedule O. For example, in adjusting the 1959 unpaid losses outstanding for workmen's compensation, the claimed unpaid losses outstanding for each of the years 1950 through 1954 were compared to the development of those claimed unpaid losses outstanding as derived from the 1955 through 1959 annual statements. The unpaid losses outstanding claimed as of 1950 were developed to 1955, unpaid losses outstanding claimed as of 1951 were developed to 1956, and so forth. The average of these experience rates was used to adjust the 1959 claimed unpaid losses for workmen's compensation.

In each line of insurance, for each of the years involved, where the overstatement thus ascertained by comparison with prior experience exceeded the 15-percent tolerance, an adjustment was made by respondent down to the 15-percent tolerance point. Thus, if the applicable ratio of claimed unpaid losses to

developed losses (the "experience rate") was 123 percent (as in the case of workmen's compensation), respondent adjusted the 1959 claimed unpaid losses to a figure representing 115 percent of the figure determined by respondent to be the proper figure based on petitioner's experience rate. In the case of lines showing an experience rate of claimed unpaid losses to developed losses of less than 115 percent, no adjustment was made by respondent.

There were no instances in which respondent determined an understatement of unpaid losses. However, there were only rare instances of lines of insurance where the "experience rate" of petitioner was under 100 percent, and there were no instances during the years before the Court, where the "experience rate" thus computed by respondent (i.e., the ratio of estimated unpaid losses to developed losses) was less than 85 percent.

The NAIC made audits of petitioner's annual reports every 3 years for the primary purpose of determining petitioner's solvency and ability to pay its claims. (Such audits were actually made by the Division of Insurance of the Massachusetts Department of Banking and Insurance, and participating representatives of NAIC. They were commonly referred to as "convention examinations" and are referred to herein as NAIC examinations.) In its report of examination for 1956 and 1959, NAIC determined that petitioner's unpaid losses outstanding should be decreased in the respective net amounts of $2,076,181.86 and $1,093,175. According to petitioner's witnesses, petitioner regarded NAIC examinations "seriously." However, petitioner never made adjustments to its books and accounts as a consequence of the adjustments made by NAIC auditors. There is no substantial correlation on a line by line basis between the NAIC adjustments and respondent's adjustments.

Respondent's expert witness, David Skurnick, is a well-qualified actuary with much experience in the casualty insurance field. He applied a testing technique which differed from that applied by respondent in that the loss development of prior years was compared by Mr. Skurnick to a base consisting of premiums in force (or in automobile lines, earned premiums) rather than to the base of claimed unpaid losses (used by respondent), for the 5 year series of years prior to the year at issue. An average of the ratios of claimed unpaid losses to premiums in force (or earned) in each of the lines of insurance

was then applied by Mr. Skurnick to the premiums in force (or earned) in the taxable year in order to determine the proper unpaid loss reserve for the taxable year.

Mr. Skurnick's method indicated aggregate overstatements as follows:

|  | 1959 | 1960 | 1961 |
|---|---|---|---|
| Total overreserved lines | $3,974,279 | $3,785,112 | $2,729,093 |
| Total underreserved lines | 261,360 | 0 | 170,841 |
| Net overstatement | 3,712,919 | 3,785,112 | 2,558,252 |

Respondent's method of testing petitioner's reserves for unpaid losses indicated aggregate overstatements, *before allowing the 15-percent tolerance,* as follows:

| | |
|---|---|
| 1959 | $4,463,344 |
| 1960 | 5,313,739 |
| 1961 | 5,130,229 |

Mr. Skurnick acknowledged that there are many methods of testing the reasonableness of reserves for unpaid losses and that no single method is "the correct method." He viewed respondent's method as being less accurate than his own method because respondent's method would not give credit for any correction in a past reserve inaccuracy. However, in this case, he felt that because petitioner has been reserving "consistently," this defect in method did not distort the results of respondent's method. Mr. Skurnick also expressed the opinion that the 15-percent tolerance allowed by respondent "makes the IRS method conservative." It was also his opinion that under his own method "The stability of the ratios of reserve runoff [development] to premiums indicates that a smaller tolerance would be satisfactory." In his opinion a 5-percent tolerance is adequate under his method.

As to the individual case method used by petitioner, Mr. Skurnick's view was that "the case reserve will be fairly accurate as long as there is no bias in the individual reserves" but that the existence of bias is very common. Further, he pointed out that some other method must be applied to IBNR since the individual case method provides only for the reserve of known claims.

The following schedule sets forth the subsequent development (to December 31, 1962) of petitioner's total unpaid losses for all lines of insurance as claimed by petitioner for 1959 and 1960, in

comparison with the amount of the reserve balance remaining after respondent's adjustment:

|  | 1959 | 1960 |
|---|---|---|
| Unpaid losses claimed (per annual statement) by petitioner | $30,390,690 | $29,965,729 |
| Subsequent development to 12/31/62 | [1]28,108,225 | [2]27,715,704 |
| Unpaid losses as adjusted by respondent[3] | 29,286,116 | 29,275,181 |

[1]Includes unpaid losses on pooled business at full amount claimed by petitioner, i.e., $2,857,749.
[2]Includes unpaid losses on pooled business at full amount claimed by petitioner, i.e., $3,189,724.
[3]Balance of claimed losses after deducting respondent's 1959 and 1960 adjustments of $1,104,574 and $690,548, respectively.

### OPINION

There are two issues to be decided by the Court: (1) The propriety of respondent's adjustments to petitioner's unpaid loss reserves as of December 31, 1959, December 31, 1960, and June 30, 1961, and (2) if respondent is sustained as to (1), the propriety of respondent's failure to make a corresponding adjustment to petitioner's unpaid loss reserve as of December 31, 1958.

### Issue I. "Unpaid Loss" Deductions for Taxable Years and Taxable Period at Issue

During the years and period here at issue, petitioner[3] was a casualty insurance company taxable under section 831 of the Code.[4] Section 832(b)(1)(A) defines "gross income" of companies subject to tax under section 831 as including

(1) GROSS INCOME.—The term "gross income" means the sum of—
(A) the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the National Association of Insurance Commissioners * * *

The term "underwriting income" is defined in section 832(b)(3) as meaning premiums earned less "losses incurred and

[3]See n. 1 *supra*.
[4]Statutory references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated.

expenses incurred." Section 832(b)(5) defines "losses incurred," as follows:

(5) LOSSES INCURRED.—The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows:

(A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

Since 1941, the regulations (as now embodied in sec. 1.832–4(a)(5) and 4(b), Income Tax Regs.) have addressed themselves to the subject of "unpaid losses" in the following terms:

4(a) * * *

(5) In computing "losses incurred" the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them.

(b) Every insurance company to which this section applies must be prepared to establish to the satisfaction of the district director that the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses stated in amounts which, based upon the facts in each case and the company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay. Amounts included in, or added to, the estimates of such losses which, in the opinion of the district director are in excess of the actual liability determined as provided in the preceding sentence will be disallowed as a deduction. The district director may require any such insurance company to submit such detailed information with respect to its actual experience as is deemed necessary to establish the reasonableness of the deduction for "losses incurred."

The Court sustained the validity of this regulation in *Hanover Insurance Co. v. Commissioner*, 65 T.C. 715 (1976). All that remains here to be decided (under Issue I.) is whether respondent's adjustments to petitioner's yearend estimates of unpaid losses were justified under the "fair and reasonable" test imposed by the regulation.

Petitioner, wherever possible, used the individual case method of estimating unpaid losses. These estimates were revised from time to time on the basis of developments in the particular case, but the total reserves were not tested by petitioner on the basis of prior experience. Respondent tested the reasonableness of petitioner's unpaid loss reserve for each year and the taxable

period at issue, by an "experience rate" testing technique which had been in use since 1944, as follows: for each of the separate lines of insurance coverage, respondent compared the unpaid loss reserves established in years prior to the year under examination with the loss actually paid with respect to such years.[5] For each line of coverage where this comparison showed that a reserve in prior years had been overstated by an average of more than 15 percent, the reserve in that line for the year under examination was reduced to the 15 percent "tolerance" figure.

The issue before the Court is essentially a valuation issue, i.e., the assignment of a fair and reasonable value to "unpaid losses," and the petitioner has the burden of proving the respondent's determination to be wrong. *Welch v. Helvering*, 290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Section 1.832–4(b), Income Tax Regs., specifically places the burden upon the petitioner to establish "to the satisfaction of the district director" that the "unpaid losses" component of "losses incurred" comprises "actual unpaid losses." Having sustained the validity of this regulation in *Hanover Insurance Co. v. Commissioner, supra*, it clearly follows that the burden of proving error in respondent's determination rests upon the petitioner.[6]

Petitioner has not succeeded in carrying that burden. Petitioner's direct proof consisted primarily of a description of the methods it used in placing a dollar figure on its estimated liability on each case reported to it. The greater part of its loss reserves was the aggregate amount of such individual case reserves. Theoretically and ideally, the aggregate of the individual case reserves should equal a fair and reasonable total reserve. But the only individual claims examiner who testified for petitioner stated that she set up reserves on as many as 150 cases per day. If she had worked an 8-hour day without interruption, that would indicate an average of approximately 3

---

[5]For the lines of coverage listed on Schedule O, the 5-year periods immediately preceding each of the years at issue were used. For the lines listed on Schedule P, respondent used the 10th through the 6th years preceding each of the years at issue.

[6]Indeed, it might well be argued, in the light of the language of the regulation, that petitioner bears the burden of showing not only that its unpaid loss reserves were reasonable but also that the respondent's adjustments constituted an abuse of discretion. Such a contention would be based upon the analogy of the bad debt reserve cases. See, e.g., *Westchester Development Co. v. Commissioner*, 63 T.C. 198, 211 (1974). However, it is not here held that petitioner bears this double burden.

minutes per claim. While it is true that this witness did not handle the "heavy" personal injury cases, the Court is left to surmise how such examiners were able to apply in practice the myriad of factors to which petitioner's officers attached importance in the evaluation of claims.

It appears to be true, as respondent's expert witness conceded, that there are many methods for testing the reasonableness of unpaid loss reserves. But the evidence in this case does not establish that with respect to the bulk of its reserve, i.e., the aggregate of its individual case reserves, the petitioner employed any method of doublechecking or testing the aggregate amounts set aside.

Petitioner argues that if it had actually set aside the amounts of unpaid loss reserves deemed proper by respondent, the subsequent development of such losses would have created a deficit, and the reserves would have been insufficient to meet loss claims. But the figures used by petitioner to illustrate this point do not take into account the 15-percent tolerance allowed by respondent.[7] This tolerance figure was an integral factor in respondent's testing technique for the taxable periods here at issue. After taking the tolerance factor into account, the 1959 and 1960 reserves allowed by respondent exceeded the unpaid losses for those years (as developed to December 31, 1962) by $1,177,891 and $1,559,477, respectively. As recently stated by this Court in *Western Casualty & Surety Co. v. Commissioner*, 65 T.C. 897, 919 (1976), on appeal (10th Cir., June 17, 1976), respondent's test of reasonableness should be directed at the total unpaid loss reserve. In the light of the respondent's tolerance factor, petitioner has not demonstrated error in respondent's method. In so holding, there is no implication that petitioner acted otherwise than in good faith, that it deliberately undertook to overstate its reserves for unpaid losses, or that petitioner was in any way "mismanaged" (as asserted by respondent). It is held simply that petitioner failed to persuade the Court that respondent's method of testing the reasonableness of such reserves was itself an unreasonable testing method.[8]

---

[7]Under respondent's current procedure (see Rev. Proc. 75–56, 1975–2 C.B. 596), respondent stated that, because of technological advances made by the insurance industry, he can no longer justify the use of the 15-percent tolerance factor. No opinion is expressed herein as to respondent's current position reflected by Rev. Proc. 75–56.

[8]The Court is not here faced with the problem presented in *Western Casualty & Surety Co. v. Commissioner*, 65 T.C. 897, 919 (1976), on appeal (10th Cir., June 17, 1976), of respondent's failure to

A final comment seems to be appropriate as to the basic legal issue in this case. As indicated at the outset, petitioner's primary contention in its opening brief was the reiteration of the argument made in *Hanover Insurance Co. v. Commissioner, supra,* that the figures shown on the NAIC form of the Annual Statement are legally binding and conclusive on respondent and that section 1.832–4(b), Income Tax Regs., is invalid. It is worthy of note that two of the findings proposed in petitioner's opening brief are:

3.68 Mass. Bonding [petitioner] regarded the N.A.I.C. examination seriously and not as perfunctory or merely routine.

3.69 Althought the N.A.I.C. examiners did make adjustments to Mass. Bonding's reserves for Unpaid Losses Outstanding, Mass. Bonding never made adjustments to its books and accounts as a consequence of those adjustments.

In successive breaths, the petitioner (1) insists on the sanctity of the Annual Statement, (2) states that the examinations by the regulatory authorities are taken seriously, and (3) that no adjustments were made by petitioner despite the examiners' findings of very substantial overstatements of reserves for unpaid losses (albeit, mostly in lines of coverage different from those adjusted herein by respondent). This sequence of nonsequiturs serves to reaffirm the correctness of the Court's 1976 opinion in this case.

*Issue II. "Unpaid Loss" Adjustment as of December 31, 1958*

During the trial of this case, the Court requested counsel, in their briefs, to comment upon the question whether respondent's adjustments of petitioner's reserves for unpaid losses effectuate a change in method of accounting, and whether section 481 of the Code is applicable. Petitioner's opening brief appears to argue against the applicability of section 481 although its reply brief asserts that respondent's adjustments constituted a change in method of computing unpaid loss reserves. Respondent's opening brief does not cite section 481, but in his reply brief respondent argues that the adjustments were not tantamount to a change in method, and that section 481 does not apply.

---

make an upward adjustment where the reserve was understated by more than 15 percent. The evidence in this case does not disclose any instance where the reserve was understated by more than 15 percent.

Section 481[9] prescribes the rules for computation of taxable income under a "method of accounting" different from the method employed by the taxpayer. Its purpose is to prevent any income from escaping tax or being doubly taxed solely because of such change in method. If the change in method was initiated by the Internal Revenue Service, amounts applicable to pre–1954 years should not be taken into account. Section 481 does not define "change in method of accounting." But section 1.446–1(e)(2)(ii)(a), Income Tax Regs., states that a "change in method of accounting" includes "a change in the treatment of any material item." Under those regulations: "A material item is any item which involves the proper time for the inclusion of the item in income or the taking of a deduction." Sec. 1.446–1(e)(2)(ii)(a), Income Tax Regs.; *Schuster's Express, Inc. v. Commissioner,* 66 T.C. 588, 594–595 (1976), affd. per curiam ___ F.2d ___ (2d Cir. 1977, 40 AFTR 2d 77–5293, 77–2 USTC par. 9495); *Western Casualty & Surety Co. v Commissioner, supra* at 912 et seq.

The statutory scheme for determining "unpaid losses" is akin to an inventory type of accounting in that the deduction for each year is the sum of losses paid during the year plus unpaid losses at the end of the year minus unpaid losses at the end of the preceding year. In the case of adjustments by respondent based upon his rejection of a longstanding and continuing practice of undervaluation of inventory, this Court has held that such adjustments constituted a change in method of accounting, obviously initiated by the respondent. *Fruehauf Trailer Co. v. Commissioner,* 42 T.C. 83, 105 (1964), affd. on another issue 356 F.2d 975 (6th Cir. 1966), cert. denied 385 U.S. 822. Contrast *Korn Industries, Inc. v. United States,* 532 F.2d 1352 (Ct. Cl. 1976), where the Court of Claims held than an accountant's error over a 4-year period in omitting 3 out of 14 elements of cost in valuing inventory was more analogous to a mathematical or posting error than to a change in accounting method. But note Rev. Rul.

---

[9]SEC. 481. ADJUSTMENTS REQUIRED BY CHANGES IN METHOD OF ACCOUNTING.

(a) GENERAL RULE.—In computing the taxpayer's taxable income for any taxable year (referred to in this section as the "year of the change")—

(1) if such computation is under a method of accounting different from the method under which the taxpayer's taxable income for the preceding taxable year was computed, then

(2) there shall be taken into account those adjustments which are determined to be necessary solely by reason of the change in order to prevent amounts from being duplicated or omitted, except there shall not be taken into account any adjustment in respect of any taxable year to which this section does not apply unless the adjustment is attributable to a change in the method of accounting initiated by the taxpayer.

77–134, 1977–18 I.R.B. 11, in which respondent (seemingly at odds with the position he has taken in the instant case as to the applicability of section 481) disagrees with *Korn Industries* on the ground that any change in a consistent pattern of inventory valuation is a "change in method" of accounting. And in the same vein, note example 7 of section 1.446–1(e)(2)(iii), Income Tax Regs., stating that a longstanding practice of undervaluing inventories is a method of accounting, and a change is such practice involves the treatment of a material item used in the overall practice of valuing inventory, and constitutes a change in method of accounting.

The applicability of *Schuster's Express, Inc.*, and *Western Casualty & Surety Co., supra*, has also been considered. *Schuster's Express* held that respondent's rejection of the deduction of additions to a reserve for certain estimated expenses, to the extent they exceeded actual disbursements, was not a change in method of accounting. The critical distinction between *Schuster's Express* and the instant case is that the challenged deductions simply represented improper accruals. They did not carry over from year to year as does the inventory-type of accounting involved in the instant case. As stated by the Court in *Schuster's Express, Inc.*, at pages 596 and 597:

The deductions claimed for insurance expenses in excess of actual expenditures do not appear to properly belong in any taxable period. Thus, we do not have before us a case involving the proper *time* for the taking of a deduction. Under the regulations, a change in method of accounting does not include a change in the treatment of an item which does not involve the proper time for the inclusion of the item of income or the taking of a deduction. Sec. 1.446–1(e)(2)(ii)(b), Income Tax Regs.

The adjustments in the instant case do clearly involve the proper time for the taking of deductions since, under the analogy of inventory-type of accounting—absent the adjustments—income would eventually be increased when the overstated loss claims are finally liquidated.

*Western Casualty & Surety Co.*, involved (so far as pertains to the section 481 issue) the respondent's rejection of the taxpayer's inclusion of unpaid commissions on deferred premiums in determining underwriting income. The Court sustained respondent's adjustment. In that case both parties had agreed that a change in the treatment of such unpaid commissions constitutes a change in treatment of a material item (not initiated by the

taxpayer) requiring an adjustment under section 481. The manner of computing such adjustment is reflected in the following excerpt from the Court's opinion (65 T.C. at 913):

> In making the adjustment required by section 481, respondent included in petitioner's 1967 income the entire accumulated reserve for unpaid commissions as of the close of 1966 ($6,527,381) less the amount applicable to pre–1954 years ($122,939), or $6,404,442. The parties dispute the propriety of respondent's adjustment under section 481 by which the entire accumulated reserve was included in petitioner's 1967 income. We are unpersuaded by petitioner's arguments, and we hold for respondent.

It is concluded that a section 481 adjustment should be made herein, patterned after the adjustment in *Western Casualty & Surety Co., supra.* [10]

In the instant case, by failing to adjust petitioner's 1958 yearend reserve for unpaid losses, respondent has effectively included in petitioner's 1959 income the entire amount of prior years' reserves to the extent that those reserves were similarly overstated. This is true because in determining the 1959 deduction for unpaid losses the 1958 yearend reserve is deducted from the sum of losses paid in 1959 and unpaid losses estimated at the end of 1959. But the Court must determine how much of the 1958 yearend overstatement was attributable to post–1953 years, since it is only to that extent that such prior accumulative overstatement may be taxed in 1959. The accounting method rejected by respondent, i.e., petitioner's failure to employ an adequate testing method in determining its total unpaid loss reserve, was a consistent method employed by petitioner. In making such computation it may therefore be fairly assumed that the 1958 yearend reserve for unpaid losses (claimed in the

---

[10]The conclusion that a sec. 481 adjustment should be made is not in conflict with *Commissioner v. Standard Life & Accident Insurance Co.*, 433 U.S. 148 (1977, 40 AFTR 2d 77–5191, 77–2 USTC par. 9480). Although that case involved life insurance company accounting, the Sumpreme Court commented in n. 24:

"Evidence of congressional respect of NAIC accounting methods is not limited to the portion of the Code concerning life insurance companies. In defining 'gross income' and 'expenses incurred' for purposes of taxing certain other insurance companies, Congress expressly requires computations to follow 'the annual statement approved by the National Convention of Insurance Commissioners.' 26 U.S.C. §832(b)(1)(A), (b)(6)."

The Supreme Court's use of the term "accounting methods," as set forth above, was not in the context of sec. 481, and is not inconsistent with this Court's opinion in *Hanover Insurance Co., supra,* that although the NAIC form is to be followed, the actual figures are not likewise sanctified. *Standard Life & Accident Insurance Co.*, did not deal with the validity of the regulation (sec. 1.832–4 (b)) upon which respondent here relies in justification of his method of testing petitioner's estimates of unpaid losses.

amount of $31,257,371) was overstated in the same proportion as respondent's 1959 reduction ($1,104,574) bears to the total 1959 yearend reserve claimed by petitioner ($30,390,690), i.e., 3.63 percent. Applying this percentage to the 1958 yearend reserve, produces an overstatement of unpaid poss reserve for 1958 of $1,134,642.

As above stated, the amount of overstatement of this same reserve must be determined as of the 1953 yearend. Petitioner's 1953 yearend unpaid loss reserve was $30,097,672. Applying the 3.63 percentage factor to determine the 1953 overstatement, produces an overstatement for that year in the amount of $1,092,545.

Under section 481 as it applies to years prior to the first taxable year in issue, respondent may tax in 1959 only the excess of the 1958 yearend overstatment over the 1953 yearend overstatment, i.e., $1,134,642 less $1,092,545 or $42,097. Accordingly, it is held that petitioner's 1958 yearend unpaid loss reserve, as adjusted, should be $31,257,371 (the reserve as reported) less $1,134,642 (the total overstatement of such reserve) plus $42,097 (the portion of such overstatement attributable to post–1953 years). This adjustment is in accord with the method of compliance with section 481 which was sustained by this Court in *Western Casualty & Surety Co., supra.*

In accordance with the foregoing, it is held that respondent is sustained in his adjustments for the years 1959, 1960, and the period ending June 30, 1961, with the exception that a further adjustment should be made as to the year 1959 to conform to the holding hereinabove set forth under Issue II.

*Decision will be entered under Rule 155.*