**HANOVER INSURANCE COMPANY, Successor in interest to Massachusetts Bonding and Insurance Company, Petitioner-Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 78–1407.

United States Court of Appeals, First Circuit.

Argued March 15, 1979.

Decided May 8, 1979.

Paul A. Teschner, Chicago, Ill., for peti-
tioner-appellant.

Daniel F. Ross, Atty., Tax Div., Dept. of Justice, Washington, D. C., with whom M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews and Richard W. Perkins, Attys., Tax Div., Dept. of Justice, Washington, D. C., were on brief, for respondent-appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

PETTINE, District Judge.

Appellant Hanover Insurance Company (Hanover) seeks this Court's review of a decision of the United States Tax Court upholding the Commissioner's determination of a deficiency in the income tax of Massachusetts Bonding and Insurance Company (MBI) for the taxable year 1960. Hanover is the successor in interest to MBI, which was merged into Hanover on June 30, 1961.

MBI filed federal income tax returns for its calendar years 1959 and 1960 and its taxable period ending on June 30, 1961 (the date of its merger into Hanover) with the District Director of the Internal Revenue Service in Boston, Massachusetts. On December 20, 1970 the Commissioner issued a Notice of Deficiency to Hanover in which he determined a deficiency of $441,081.10 for 1959 and $446,206.34 for 1960. On March 30, 1978 the United States Tax Court entered its final decision in this matter, in which it found that there was a deficiency in MBI's 1960 income tax of $331,644.28.[1] It is that determination which is challenged before this Court.

MBI was a casualty insurance company with its principal place of business in Massachusetts.[2] During the years at issue here, it wrote 24 lines of casualty insurance.

MBI filed annual statements with the Massachusetts Commissioner of Insurance, utilizing the form of an annual statement approved by the National Association of Insurance Commissioners (N.A.I.C.).[3] That form also was utilized by MBI in its computation of taxable income for federal tax purposes pursuant to the requirements of I.R.C. § 832.

I.R.C. § 832(a) defines "insurance company taxable income" as "the gross income as defined in subsection (b)(1) less the deductions allowed by subsection (c)." Subsection (b)(1)(A) defines "gross income" for this purpose as

the combined gross amount earned during the taxable year, from investment income and from underwriting income as provided in this subsection, computed on the basis of the underwriting and investment exhibit of the annual statement approved by the [N.A.I.C.].

"Underwriting income" is defined thereafter as "the premiums earned on insurance contracts during the taxable year less losses incurred and expenses incurred." § 832(b)(3). § 832(c) also authorizes the deduction from taxable income of losses incurred.

The present dispute involves the computation of MBI's "losses incurred" under § 832(b)(3). The Code provides for computation of this figure as follows:

The term "losses incurred" means losses incurred during the taxable year on insurance contracts, computed as follows: (A) To losses paid during the taxable year, add salvage and reinsurance recoverable outstanding at the end of the preceding taxable year and deduct salvage

---

* Of the District of Rhode Island, sitting by designation.

1. The Tax Court denied Hanover's motion to dismiss on January 7, 1976. *Hanover Insurance Company v. Commissioner of Internal Revenue*, 65 T.C. 715; appeal dismissed, No. 1557–71 (May 11, 1976). In accordance with its opinion on the merits, *Hanover Insurance Company v. Commissioner of Internal Revenue*, 69 T.C. 260 (1977), the Tax Court held that no deficiency existed in MBI's 1959 tax, but it

recomputed the deficiency in MBI's 1960 tax in the final amount of $331,644.28.

Both parties filed timely notice of appeal. The Commissioner has dismissed his appeal, leaving only Hanover's challenge as to the 1960 deficiency pending before th●Court.

2. For a more detailed discussion of the facts and financial data involved in this case, the reader is referred to the opinion of the Tax Court on the merits, 69 T.C. at 262–268.

3. *See* M.G.L.A. c. 175 § 25.

and reinsurance recoverable outstanding at the end of the taxable year.

(B) To the result so obtained, add all unpaid losses outstanding at the end of the taxable year and deduct unpaid losses outstanding at the end of the preceding taxable year.

I.R.C. § 832(b)(5).

Treas.Reg. § 1.832–1 (1960)[4] repeats the requirements of I.R.C. § 832 and admonishes insurance companies to "be prepared to establish to the satisfaction of the District Director" that

the part of the deduction for "losses incurred" which represents unpaid losses at the close of the taxable year comprises only actual unpaid losses stated in amounts which, based upon the facts in each case and company's experience with similar cases, can be said to represent a fair and reasonable estimate of the amount the company will be required to pay.

The regulation warns further that amounts in excess of actual liability so determined will be disallowed as deductions, and that the District Directors may require submission of information sufficient to establish "the reasonableness of the deduction for 'losses incurred' ".[5]

Thus the Code recognizes that "unpaid losses outstanding" can only be estimated for a given year when that year's return is filed, because the amount of payments which will be made on all outstanding claims cannot be ascertained until settlement or litigation of all claims arising during that year. Treas.Reg. § 1.832–1(b) anticipates that insurance companies will deduct only a "fair and reasonable estimate" of actual unpaid losses outstanding. The Commissioner's notice of deficiency for 1959 and 1960 was the result of the parties' differences of opinion as to the proper amount of deduction which should be allowed in the computation of MBI's taxable income for those years.

MBI calculated its unpaid loss reserve— the same figure it claimed as a deduction— according to two methods. One method involved examination of individual cases by claims examiners who estimated the dollar value of liability. A second approach, used to estimate the value of claims which presumably had occurred but were not yet reported, involved application of a formula based on historical experience to premiums in force for a given period.[6]

For the taxable year 1960, the Commissioner's method for testing the reasonableness of an insurance company's unpaid loss deduction was based on a historical analysis of prior years' estimated and actual losses.[7] The Commissioner examined the taxpayer's

---

4. As amended by T.D. 6867, 30 F.R. 15094, (December 12, 1975).

5. The regulation also refers to the N.A.I.C. form:

The underwriting and investment exhibit [of the N.A.I.C. form] is presumed to reflect the true net income of the company, and insofar as it is not inconsistent with the provisions of the Code will be recognized and used as a basis for that purpose. All items of the exhibit, however, do not reflect an insurance company's income as defined in the Code.

. . .

The regulation goes on to require that certain items on the N.A.I.C. form be excluded in the computation of taxable income, and that, in computation of the item entitled "losses incurred", "the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them." § 1.832–1(a).

6. See 69 T.C. 263–264.

7. The Commissioner's testing method applicable to the year 1960 was set forth in Mimeo R.A. No. 1366, issued by the Commissioner of Internal Revenue on July 1, 1944. It provides in relevant part:

In the determination of unpaid losses . . . consideration should be given to the following requirements:
1. That the determination of unpaid losses at the close of each year must represent actual unpaid losses as nearly as it is possible to ascertain them. . . .
2. That the Bureau is not required to accept the figures shown in the [N.A.I.C.] Annual Statement. . . .
3. That particular attention be given, in the investigation of the books and records of the taxpayers, for evidence of "leading" in the computation of the deduction for unpaid losses.
4. That an adjustment at the close of each year . . . should be made if the information available indicates the estimates of

experience in years prior to the taxable year in question to determine whether reserves for losses were greater or less than actual losses for the prior years. The actual, or "developed" losses were ascertained after they were paid out in subsequent years. Although the testing method varied among different categories of insurance,[8] the ultimate rule of thumb was the same for all lines of insurance. If reserves for prior years proved to have exceeded developed losses for those years by more than 15 percent, the deduction for the taxable year in question was presumed to overstate reality by the same proportion. The Commissioner would reduce the deduction allowed for the year at issue by a percentage equal to the percentage by which prior years' estimates were excessive by more than 15 percent. Thus, for example, if the "experi-

> unpaid losses for 1944 or subsequent years are excessive. . . .
>
> With respect to Item 4 above, the policy of the Bureau will be as follows:.
>
> A. That the total of unpaid losses at the end of any year should be the aggregate of the reasonable estimates of the outstanding losses made approximately as of the close of the year on the basis of the facts in each claim and the taxpayer's experience with similar claims.
>
> B. That in determining whether or not the estimate of unpaid losses is reasonable, a comparison should be made with the past experience of the company and with subsequent payments of such losses, or by any other proper comparison.
>
> C. In the application of B the following method of verifying the reasonableness of unpaid losses of casualty and surety companies on all lines other than Workmen's Compensation and Public Liability is suggested: Information that will disclose the reasonableness of the unpaid loss liability as set up by the taxpayer may be secured from Schedule O of the Annual Statement. A comparison of the amounts still estimated as unpaid at the end of such year, (developed losses) should be made with the previous year's estimate of unpaid losses (estimated losses) to determine the ratio of "estimated losses" to one-year "developed losses". Such comparison should be made separately for each year for the previous five years. If the average "estimated losses" of the previous five years is found to be not more than 115% of the five-year average of the one-year "developed losses", the estimates made will be regarded as being reasonably correct, and no adjustment for the current year would ordinarily be required.
>
> In the event that the five-year average of "estimated losses" is in excess of 115% of the five-year average of the one-year "developed losses" then the unpaid loss liability of the company will be deemed to be excessive in the current year and an adjustment will ordinarily be required. In determining the extent of the adjustment to be made to the outstanding losses at the end of the year, in accordance with the preceding sentence, due regard should be given to the actual amount paid thereon as shown by subsequent developments, as corroborative evidence of the overstatement of the liability.
>
> D. In the application of B of [sic] following method or verifying the reasonableness of the unpaid losses (exclusive of ocean marine) of companies doing business in fire insurance and allied lines, is suggested:
>
> A development of the outstanding losses of the current year alone, (or of the current year and one or more of the previous years at the election of the taxpayer) shall be used to ascertain the reasonableness of the liability as claimed. Where the amounts paid on the current year's losses (or on as many years as are used by the taxpayer) discloses that the estimate was not in excess of 115% of the amounts paid in respect thereto the estimates shall be considered as reasonable. Where such estimate was in excess of 115%, it will be considered excessive and an adjustment will ordinarily be required.
>
> E. Discrepancies of 15% between the estimate for unpaid losses and the amounts required to be paid thereon, will ordinarily be presumed to be reasonable variances due to the nature of the insurance business in general.

This procedure is no longer followed. Rev. Proc. 75–76, 1975–2 C.B. 596, supersedes Mimeo R.A. 1366, and notes that "[t]he long term administrative practice enunciated in [the prior procedure] can no longer be justified in view of the technological advances made by the insurance industry in the area of statistical collection and analysis". Rev.Proc. 75–56, § 3.01. A standard of reasonableness in unpaid loss estimates is still applied; however, the 15% tolerance formerly allowed is no longer applicable.

8. "In making such comparisons respondent applied a longer testing or development period for so-called Schedule P lines than for Schedule O lines of insurance in determining petitioner's 'experience rate'. Schedule P of the Annual Statement included Auto Liability, Liability other than Auto, and Workmen's Compensation. Schedule O covered most of the remaining lines of insurance." 69 T.C. 264–65.

ence rate" (past estimates divided by actual losses) was 123 percent, the Commissioner would assume that the claimed deduction for the year at issue represented 123 percent of actual losses for that year. A loss deduction would be allowed only equal to 115 percent of the amount determined by the Commissioner to be the proper figure based on the taxpayer's experience rate.[9]

The Tax Court also heard evidence concerning audits of MBI's annual statements by the National Association of Insurance Commissioners. Those audits, conducted at three year intervals by Massachusetts state officials together with N.A.I.C. representatives, showed significant overstatements in MBI's unpaid losses outstanding reserves for 1956 and 1959. However, MBI did not make adjustments to its books and accounts as a result of those audits.

█ The Commissioner presented testimony from "a well qualified actuary with much experience in the casualty insurance field"[10] before the Tax Court. This expert applied his own testing technique, which was different from that used by the Commissioner, to find significant overstatements in unpaid loss reserves for 1959, 1960, and the taxable period ending on June 30, 1961 comparable in magnitude to those determined by the Commissioner.[11]

The Tax Court set forth the following schedule[12] to demonstrate the development of MBI's unpaid losses for which deductions were claimed in 1959 and 1960, as compared with the amount of deductions allowed by the Commissioner:

| | 1959 | 1960 |
|---|---|---|
| Unpaid losses claimed (per Annual Statement) by MBI | $30,390,690 | $29,965,729 |
| Subsequent development to 12/31/62 (actual losses) | $28,108,225 [1] | $27,715,704 [2] |
| Unpaid losses as adjusted by the Commissioner [3] | $29,286,116 | $29,275,181 |

[1] Includes unpaid losses on pooled business at full amount claimed by MBI, i.e., $2,857,749.

[2] Includes unpaid losses on pooled business at full amount claimed by MBI, i.e., $3,189,724.

[3] Balance of claimed losses after deducting the Commissioner's 1959 and 1960 adjustments of $1,104,574 and $690,548, respectively.

It should be noted that the adjustment made by the Commissioner was only for the purpose of determining the proper loss deduction for federal tax purposes and had no effect on the reserves actually held by MBI to cover payment of unpaid losses. The table set forth above merely demonstrates that, had MBI maintained reserves in accordance with the Commissioner's calculation rather than its own, it still would have had sufficient funds in reserve to cover unpaid losses arising from 1960 claims.

As we have indicated, the adjustment made by the Commissioner was the basis of the deficiency he assessed for 1960 which, in turn, was recomputed by the Tax Court and is the subject of this appeal.

Hanover first argues that it correctly computed its gross income on the basis of the underwriting and investment exhibit of the annual statement approved by the N.A.I.C. Because I.R.C. § 832(b)(1)(A) and Treas.Reg. § 1.832-1 require computation of insurance company income on this basis, Hanover claims that its computations are insulated thereby from adjustment by the

9. Thus, if a loss deduction of $30 million were claimed for the year in question, but the insurance company's experience rate theretofore was 123%, the Commissioner would allow a loss deduction for that year of only $28,048,-779, computed as follows:

$$\frac{123}{100} = \frac{\$30,000,000,}{\text{presumed actual losses}} = \$24,390,243.$$

The Commissioner would allow up to 115% of presumed actual losses. $(1.15) \times (\$24,390,243) = \$28,048,779.$

10. Hanover "takes exception" to the Tax Court's finding that the Commissioner's expert witness, Mr. David Skurnick, is "well qualified". We find no abuse of discretion in the Tax Court's admission of his testimony. *Salem v. United States Lines Co.*, 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962).

11. *See* 69 T.C. at 267.

12. *Id.* at 268.

Commissioner. It relies on this Court's decision in *Commissioner of Internal Revenue v. New Hampshire Fire Insurance Company*, 146 F.2d 697 (1st Cir. 1945) in support of this contention.

Hanover's reliance on our decision in *New Hampshire Fire Insurance, supra,* is misplaced. In that case we merely enforced Congress's requirement that the N.A.I.C. form be followed as the only acceptable *method* for computing an insurance company's gross income. We recognized explicitly that "as a fundamental principle tax returns must truly reflect [represent] income, and . . . returns based exclusively on the [N.A.I.C.] Form do not." *Id.* at 700. Despite this recognition, we held that the form must be followed because Congress, when it imposed this requirement on insurance companies, was faced with the "axiomatic fact that insurance bookkeeping and accounting are highly complicated processes" and its choice of reliance on the N.A.I.C. form was the result of "[an] apparent search for a simple method for reporting income for tax purposes." *Id.*

There is no support in *New Hampshire Fire Insurance, supra,* for the contention that the mere inclusion of certain figures on the congressionally-approved annual statement can prevent the Commissioner's adjustment for the purpose of identifying tax deficiencies. As the Tax Court concluded in its denial of Hanover's motion to dismiss, accepting this position

> would entail our speculating and concluding that the First Circuit's blessing of the [N.A.I.C. form] . . . was tantamount to a sanctification of the estimated figures as well as the form itself, no matter how unfair or unreasonable.
>
> 65 T.C. at 719.

Hanover's reliance on *Western Casualty and Surety Company v. Commissioner,* 571 F.2d 514 (10th Cir. 1978) is also misplaced. In that case the Tenth Circuit Court of Appeals considered the question of whether an insurance company may include as de-

ductions commissions on deferred premium installments in its computation of "expenses incurred" using the N.A.I.C. form as required by I.R.C. § 832(b)(6). The Court held that

> the NAIC forms are not absolute and . . . where they conflict with the ordinary requirements of [I.R.C.] § 162 ["Trade or business expenses"], the latter prevails.
>
> .    .    .    .    .
>
> Deference to the NAIC would allow the deduction of commissions which had not been actually paid or incurred and were mere accounting entries.
>
> *Id.* at 517.18.

We must conclude that the Tax Court was correct in holding that MBI's adherence to the N.A.I.C. annual statement did not prevent the Commissioner from contesting the figures contained therein. Congress' "preference for N.A.I.C. accounting methods", *Commissioner v. Standard Life and Accident Insurance Company,* 433 U.S. 148, 161, 97 S.Ct. 2523, 53 L.Ed.2d 653 (1977), should not be interpreted to inhibit the Commissioner's authority to enforce I.R.C. § 832. His inquiry into the validity and accuracy of the figures reported under that provision, guided by the standard of reasonableness found in Treas.Reg. § 1.832–1,[13] is a necessary step in his exercise of that authority.

Hanover's second contention is that the Commissioner's regulation enforcing I.R.C. § 832, Treas.Reg. 1.832–1, is violative of the so-called McCarran-Ferguson Act, 15 U.S.C. § 1011 *et seq.* (1976). That law provides that no act of Congress may "be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance . . . ." Hanover gives two reasons for its position: that the regulation and the Commissioner's enforce-

---

**13.** Hanover also challenges the validity of the "reasonableness" standard contained in § 1.832–1. *See* discussion at 1219–1220, *infra.*

ment procedure [14] do not, in the long run, increase federal tax revenues and therefore constitute an unwarranted intrusion upon the accounting practices of insurance companies and that the Commissioner's enforcement of Treas.Reg. § 1.832–1 subjected the unpaid losses of MBI to restrictions whereby the Commissioner could regulate this item in violation of the McCarran-Ferguson Act.

The court disagrees that enforcement of § 832 in the manner accomplished in this case does not increase federal tax revenues.[15] Although revenues lost through overstated deductions in a given year presumably will be recaptured in succeeding years, a consistent pattern of overstatement will result in a "float" or tax deferral which is of real advantage to a taxpayer and corresponding disadvantage to the federal treasury. It can amount to an interest-free loan from the federal government.[16]

█ Hanover contends that Treas.Reg. § 1.832–1(b) gives IRS District Directors a "visitorial power" to review unpaid losses claims and thereby allows improper regulation in violation of the McCarran-Ferguson Act. This argument fails for two reasons. First, I.R.C. § 832 "specifically relates to

the business of insurance"—it deals exclusively with taxation of insurance companies —and, therefore, the McCarran-Ferguson Act is inapplicable by its own terms. Because "the power of the federal government to tax was not delegated to the states" by the Act, *Industrial Life Insurance Company v. United States,* 481 F.2d 609, 610 (4th Cir. 1973), the application of federal tax laws to insurance companies is not inconsistent with the intent of Congress to refrain from interfering with state regulation of the insurance business. *See United States v. Sylvanus,* 192 F.2d 96 (1st Cir. 1951) (McCarran-Ferguson Act did not prevent enforcement of federal statute punishing mail fraud).

█ In addition, we cannot accept Hanover's contention that enforcement of Treas. Reg. § 1.832–1(b) constitutes regulation. MBI was free to maintain reserves in any amount for unpaid losses. I.R.C. § 832 and accompanying regulations do not limit an insurance company's freedom to keep records in whatever manner it chooses for financial or state regulatory use. Any increased burden on the insurance company is no greater than that borne by other taxpayers who use different data for tax purposes as opposed to other purposes.

---

**14.** *See* notes 5 and 7, *supra.*

**15.** Even if this contention were valid, it does not necessarily follow that enforcement of Treas.Reg. § 1.832–1 constitutes regulation of the insurance industry; the absence of financial benefit to the government seems irrelevant to the question of whether there is a regulatory effect on the industry.

**16.** Hanover relies on *Continental Insurance Company v. United States,* 474 F.2d 661, 208 Ct.Cl. 501 (1973), wherein the Court of Claims ruled on the propriety of an insurance company's exclusion of certain items from salvage recoverable adjustments to losses deducted from gross income pursuant to I.R.C. § 832. The issue was whether such adjustments should include paid salvage recoveries or estimates of recoveries to be realized in the future. The court upheld the taxpayer's exclusion and noted that

> . . . in the long run it will make no substantial difference in the amount of taxes paid whether salvage recoveries are treated on a "paid" basis or whether estimates are required to be made. Sooner or later salvage recoveries must be taken into income for tax

purposes. Thus, there is no question of tax avoidance presented here, but merely a question of when salvage is to be taken into account for purposes of the federal income tax.

*Id.* at 671.

In allowing this exclusion, the Court of Claims was mindful of the need for uniformity in treatment of salvage items throughout the states. Relevant Treasury Regulations provided that "if any state in which an insurer did business excluded estimates of future salvage recoveries . . . such estimates would be excluded for federal income tax purposes." *Id.* at 668.

To the extent that the Court of Claims found "no significant offsetting advantage to the government" in allowing taxpayer's exclusions and resultant reduction of its taxable income, we find *Continental Insurance, supra,* inapplicable to the present case. For example, given the deficiency of $331,664.28 assessed here and an annual interest rate, before compounding, of 7%, the disadvantage in delayed receipt of these funds of one year amounts to $23,215.10 —not an insignificant figure.

Hanover challenges directly the validity of Treas.Reg. § 1.832–1 because, by purporting to authorize the Commissioner to determine whether unpaid loss deductions exceed "a fair and reasonable estimate of the amount the company will be required to pay" and to assess tax deficiencies based upon such determinations, the regulation allegedly exceeds the scope of the statute it interprets, I.R.C. § 832. Because this statute does not empower explicitly the Commissioner to apply it according to a "fair and reasonable" requirement, Hanover's argument is that there is no authority for such a requirement and that the regulation is invalid to that extent.

■■ In support of its argument Hanover relies on cases holding that there is no power in an administrator to construe an unambiguous statute, *see, e. g., United States v. Fisher,* 6 U.S. (2 Cranch) 358 (1804); *Dollar Savings Bank v. United States,* 86 U.S. (19 Wall.) 227, 22 L.Ed. 80 (1874); *Swift Company v. United States,* 105 U.S. 691, 26 L.Ed. 1108 (1882), together with cases in which tax regulations have been struck down because of direct conflict with specific provisions of the Code. *See, e. g., Koshland v. Helvering,* 298 U.S. 441, 56 S.Ct. 767, 80 L.Ed. 1268 (1936). These authorities are inapposite for two reasons. First, I.R.C. § 7805 specifically empowers the Secretary of the Treasury, or his delegate, to "prescribe all needful rules and regulations for the enforcement" of Code provisions. The United States Supreme Court has indicated that "regulations promulgated under [the Secretary's] authority, if found to 'implement the congressional mandate in some reasonable manner' must be upheld." *United States v. Cartwright,* 411 U.S. 546, 550, 93 S.Ct. 1713, 1716, 36 L.Ed.2d 528 (1973) (citations omitted); *Commissioner v. Winslow,* 113 F.2d 418, 423 (1st Cir. 1940). The regulation in question clearly meets this test; Treas.Reg. § 1.832–1 reflects explicitly the computation method for losses and gross income which is set forth in the statute, I.R.C. § 832. By providing that District Directors may determine whether deductions "can be said to represent a fair and reasonable estimate of the amount the company will be required to pay," the regulation does no more than give notice to the taxpayer that the Code will be enforced pursuant to the mandate of § 7805. To hold otherwise would vitiate this section of the Code; insurance company taxpayers could deduct any amount calculated according to the method in § 832(b) and claim immunity from administrative review. Clearly this was not the intent of Congress.[17]

■ Moreover, Hanover ignores the fundamental premise that taxpayers must prove their entitlement to deductions. There is no burden on the Commissioner to justify his disallowance of a claimed deduction. *New Colonial Company v. Helvering,* 292 U.S. 435, 440, 54 S.Ct. 208, 78 L.Ed. 542 (1934); *Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212 (1933). The regulation at issue here restates that principle, providing that insurance companies "must be prepared to establish" the validity of their loss deduction reserves "in amounts which, based upon the facts in each case and the company's experience with similar cases," are close to actual experience. The imposition of this requirement on insurance company taxpayers is not an impermissible expansion upon I.R.C. § 832.

Alternatively, Hanover claims to have suffered a denial of due process by the Commissioner's application of Treas.Reg. § 1.832–1 to MBI. Its argument is that I.R.C. § 7805, which delegates authority to issue regulations under the Code, contains insufficient standards for the exercise of that authority. Therefore, Hanover con-

**17.** The validity of the regulation is also supported by "the settled principle that 'Treasury regulations and interpretations long continued without substantial change, applying to unamended or substantially reenacted statutes, are deemed to have received congressional approval and have the effect of law'" *United States v. Correll, supra,* 389 U.S. at 305–306, 88 S.Ct. at 449 (citations omitted). As the Commissioner points out, the regulation or its substantially similar predecessors have been in existence for over 34 years. Appellee's Brief at 28.

tends, this delegation of legislative authority operated to deprive MBI of property without due process.

Hanover relies on *Panama Refining Company v. Ryan,* 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935) and the old war horse of *Schechter Poultry Company v. United States,* 295 U.S. 495, 55 S.Ct. 837, 79 L.Ed. 1570 (1935), both cases in which the Supreme Court invalidated New Deal legislation which delegated legislative authority to administrative bodies without sufficient standards or policies to govern the administrative exercise of that authority. Because there is no requirement of "reasonableness" pertaining to unpaid loss deductions in I.R.C. § 832(b), Hanover contends that the promulgation of Treas.Reg. § 1.832–1 was not "needful" within the meaning of I.R.C. § 7805. Thus the regulation, which does require that loss deductions be "fair and reasonable" estimates of actual losses, constitutes an expansion of § 832 not governed by a statutory standard. This, it claims, is a denial of due process.

This argument is frivolous. The Supreme Court has made repeated reference to Congress' delegation of authority under I.R.C. § 7805. *See, e. g., United States v. Cartwright, supra,* 411 U.S. at 550, 93 S.Ct. 1713; *Bingler v. Johnson,* 394 U.S. 741, 750–751, 89 S.Ct. 1439, 22 L.Ed.2d 695; *United States v. Correll,* 389 U.S. 299, 306 307, 88 S.Ct. 445, 19 L.Ed.2d 537. Standards for the exercise of this power are found in the substantive provisions of the Code which are enforced by the regulations in question. I.R.C. § 7805 explicitly requires that regulations be "needful . . . for enforcement" of the Code. "The role of the judiciary in cases of this sort begins and ends with assuring that the Commissioner's regulations fall within his authority to implement the congressional mandate [of § 7805] in some reasonable manner." *United States v. Correll, supra,* 389 U.S. at 307, 88 S.Ct. at 450.

▮ Clearly, the purpose of I.R.C. § 832(b)(5) is the accurate computation of losses incurred, and an element of the req-

uisite calculation is the "unpaid losses outstanding" figure. Treas.Reg. § 1.832–1 does no more than require that the amount of unpaid losses estimated and deducted by insurance companies should comport with reality. Where the Code explicitly allows deduction of an item which cannot be valued precisely at the time the deduction is claimed, no more reasonable manner of implementing Congress' purpose can be found than a regulation which requires the deduction to be a "fair and reasonable" estimate of actual experience. It is spurious to suggest that in so doing the Commissioner has acted without the benefit of the Congressional direction contained in § 832 itself.

In a final challenge to the assessment of this deficiency Hanover claims that its determination of unpaid loss reserves was, in fact, accurate and that the Commissioner's adjustment was in error and reached in violation of his own regulation. For the reasons set forth below, we find this claim to be without merit.

▮ The determination of a fair and reasonable estimate of a taxpayer's unpaid losses is essentially a valuation issue and a question of fact. Thus, the scope of our inquiry is limited to deciding whether the Tax Court's determination on this issue was clearly erroneous. *Commissioner v. Duberstein,* 363 U.S. 278, 291, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). As we have noted, it was Hanover's burden to prove its entitlement to a deduction beyond that allowed by the Commissioner. *Welch v. Helvering, supra,* 290 U.S. at 115, 54 S.Ct. 8.

The Tax Court heard ample evidence of MBI's overstatement of unpaid loss reserves. Apart from the financial data submitted by the government on this point,[18] the N.A.I.C. itself, in examinations conducted in 1956 and 1959, had determined that MBI's losses were overstated. In addition, the Commissioner's expert testified that, in his opinion, MBI's reserves were "unreasonably high." In response to this evidence,

---

18. This data is found at pp. 628-631 of the record appendix.

MBI merely relied on its own computation methods.[19]

Having examined the record and financial data presented by the parties, we cannot say that the Tax Court's determination was clearly erroneous. While Hanover has attempted to show that the reserves allowed by the Commissioner resulted in understatement of developed losses, it has done so based on the assumption that the Commissioner allowed only 100% of what he determined to be actual losses for 1960. In fact, the Commissioner allowed 115% of actual losses (as determined according to Mimeo R.A. 1366), and a comparison of his allowance with actual experience demonstrates that it adequately covered actual losses for 1960.[20]

Finally, Hanover contends that the Commissioner violated Treas.Reg. § 1.832-1(b) because he did not examine each of MBI's cases to determine whether the Company's loss estimates were reasonable. This argument misses the mark because the regulation does not require the Commissioner to undertake such an analysis. It provides that the taxpayer "must be prepared to establish" that its unpaid loss deduction "comprises only actual losses stated in amounts which, based upon the facts in each case and company's experience with similar cases" are fair and reasonable estimates. The Commissioner's method of ascertaining deductions he will allow is not circumscribed by the regulation.

In conclusion, we find that MBI's unpaid loss deduction was not insulated from the Commissioner's review by I.R.C. § 832, and that the McCarran-Ferguson Act does not bar application of this Code section to insurance companies through Treas.Reg. § 1.832-1. We reject Hanover's arguments regarding the validity of that regulation, and we find that the decision of the Tax Court upholding a recomputed deficiency for 1960 was not clearly erroneous.

The decision of the Tax Court is, therefore, affirmed.

**19.** See n. 6, *supra.*